[No. 20706. In Bank.— February 23, 1892.]

THE PEOPLE, RESPONDENT, v. GEORGE H. W. BRUGGY, APPELLANT.

CRIMINAL LAW — HOMICIDE — MANSLAUGHTER. — To reduce a felonious homicide from the grade of murder to that of manslaughter, upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions; and it must appear that the party acted under the smart of his sudden passion and resentment.

ID. — INSTRUCTIONS — SELF-DEFENSE — APPARENT DANGER. — Upon the trial of a defendant charged with murder, an instruction to the jury, that, "to justify the killing of another in self-defense, it must appear that the danger was so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary," when properly construed, means that the danger must appear *to the defendant*, and not *to the jury*; although the instruction would be clearer and more satisfactory if the words "to the defendant as a reasonable man" were inserted after the words "must appear"; yet where the jury are elsewhere unequivocally instructed as to the law of apparent danger, they could not be misled by the instruction as given.

ID. — JUSTIFIABLE HOMICIDE — CONDITIONS OF INSTRUCTION NOT ASKED FOR. — An instruction to the jury, that if the defendant killed the deceased while resenting an attack on the part of the deceased to murder him, or an attempt to do him great bodily harm, the killing was justifiable, does not confine the defendant's right to kill the deceased exclusively to the case of an attack to murder or an attempt to do great bodily harm; and an objection upon appeal, that it should have stated further, that an attempt to kill the defendant by the deceased, either with or without malice aforethought, would have justified the killing by the defendant, will not be sustained, if the defendant did not ask for such additional conditions.

ID. — PURSUIT OF DECEASED WITH DEADLY WEAPON — MURDER — SELF-DEFENSE. — If one, with murder in his heart and a deadly weapon in his hand, pursues and overtakes another, and then and there shoots and kills him, he is guilty of murder, regardless of what the deceased

may have been doing at the moment of the shooting; and no question of his declining a further struggle, or of self-defense, is involved in such a case.

ID. — INSTRUCTION — HYPOTHESIS OF MURDER — EXCLUSION OF SELF-DEFENSE.— An instruction, founded upon evidence in the case upon a trial for murder, that if the deceased, seeing the defendant draw a pistol, ran away, and the defendant, with intent willfully and deliberately to murder, pursued and overtook the deceased when unarmed and showing no disposition to kill and murder the defendant, and that the defendant then and there, without believing himself in danger of losing his life, fired the fatal shot and killed the deceased, the evidence shows no self-defense, is properly given.

ID. — DEGREES OF MURDER — DRUNKENNESS — INSTRUCTION — BELIEF OF JUDGE AS TO GUILT. — Where the court had fully instructed the jury as to the definition of manslaughter, and stated to them that under the information and the evidence the defendant could be convicted of such offense, an instruction defining the two degrees of murder, and stating that in determining the degree any evidence tending to show the mental *status* of the defendant is a proper subject for the consideration of the jury, that the fact that defendant was drunk does not render the act less criminal, and in that sense is not available as an excuse, but that there is nothing in the case to exclude it as evidence upon the question as to whether the act was deliberate and premeditated, that "it was murder, whether premeditated or not," and that the question of the degree of murder was one of fact for the jury, is not subject to the objection that the jury would understand that the court considered the defendant guilty of murder.

ID. — TECHNICAL ANALYSIS OF INSTRUCTIONS. — The practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions to the jury.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial.

The facts are stated in the opinion of the court and in the dissenting opinions.

*J. C. Sims*, for Appellant.

*Attorney-General Johnson, Attorney-General Hart*, and *A. G. Burnett*, for Respondent.

GAROUTTE, J. — The defendant was convicted of murder of the first degree, and is under sentence of death. He appeals from the judgment and order denying his motion for a new trial, and insists that the evidence is not sufficient to support the verdict. The jury had before them many eye-witnesses to the homicide, and also

evidence showing all the surrounding circumstances. There was some evidence tending to prove the guilt of the defendant as charged, and for that reason, under well-settled principles, we would not be justified in setting aside the verdict.

It is insisted that many of the instructions containing the law of the case as given by the court to the jury were erroneous and prejudicial to the rights of the defendant. The instructions necessary to consider in the discussion of this question are as follows: —

" 1. Malice may be express or implied. It is express when there is manifest a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

" 2. Under the information in this case, the defendant may, if the evidence warrant it, be convicted of manslaughter. This is defined by our statute to be the unlawful killing of a human being without malice, and is of two kinds: 1. Voluntary, upon a sudden quarrel or heat of passion; 2. Involuntary, in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.

" 3. To reduce a felonious homicide from the grade of murder to that of manslaughter, upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions; and it must appear that the party acted under the smart of his sudden passion and resentment.

" 4. Upon the law of self-defense, I instruct you as follows: To justify the killing of another in self-defense, it must appear that the danger was so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary. And it must appear that the per-

son killed was the assailant, or that the slayer had really and in good faith endeavored to decline further trouble before the fatal shot was fired.  If the jury believe from the evidence that the defendant, George Bruggy, at the time he fired the fatal shot which killed the deceased, Dick Louison (if he did fire such shot and kill him), believed, and had good reason to believe, that his life was in imminent danger at the hands of said Dick Louison, then I charge you that defendant was justifiable in firing said shot, and you should acquit him.

"5.  If the jury believe from the evidence in this case that the defendant, Bruggy, killed the deceased by shooting him, and that the shooting was done by Bruggy in resenting an attack on the part of the deceased to murder him, Bruggy, or an attempt on the part of the deceased to do great bodily harm to him, Bruggy, then, in such a case, I instruct you the killing by Bruggy was justifiable, and you should find the defendant not guilty.  The rule in such a case is this: What would a reasonable person, —a person with ordinary caution, judgment, and observation,—in the position of the defendant, seeing what he saw, and knowing what he knew, suppose from his situation and his surroundings?

"6.  If such reasonable person, so placed, would have been justified in believing himself in imminent danger, then the defendant would be justified in believing himself in such peril, and in acting on such appearances.  The defendant is not justified because he actually believed he was in imminent danger.  When the danger is only apparent, and not actual and real, the question is, Would a reasonable man, under all the circumstances, be justified in such belief ?  If so, the defendant would be justified.  If this was the defendant's position, it was his right to repel the aggression, and fully protect himself from such apparent danger.

"7.  If you believe from the evidence that the defendant, while upon the sidewalk, drew his pistol, with a deliberate intent to kill and murder Dick Louison, and that Dick Louison saw the pistol, and, believing himself

in danger of the defendant, ran away, and through the alley and into the saloon, to avoid the defendant; and you further believe from the evidence that the defendant, with intent to willfully and deliberately kill and murder Louison, entered and passed through the saloon with the pistol in his hand for the purpose of overtaking or meeting him and killing him; and you further believe from the evidence that he did meet the deceased coming into the saloon, through one of the back doors of the saloon, unarmed and showing no disposition to kill and murder the defendant, and that the defendant, then and there, without believing himself in danger of losing his own life at the hands of Dick Louison, fired the fatal shot, and killed said Louison,— then I instruct you the evidence shows no self-defense."

Appellant's counsel insist that instruction No. 3 is erroneous, " because, in effect, it tells the jury that although the defendant acted under the heat of passion, it could not be manslaughter unless the provocation was of such a character as would naturally excite and arouse the passions of an average man. For the question is, not whether some other person would probably have been excited or thrown into a passion by similar circumstances, but whether the defendant acted upon a sudden quarrel or heat of passion."

The instruction is clearly and entirely correct, and the principle of law as announced by appellant has no support in authority. As to the latter portion of the instruction, that " it must appear that the party acted under the smart of his sudden passion and resentment," it is so evident that such must of necessity be the law, that we refrain from a discussion of the matter. The provocation, to reduce a killing in the heat of passion from murder to manslaughter, must be of such a character as would be naturally calculated to " excite and arouse the passions." In the words of the law, it must be a considerable provocation. Persons are not allowed to work themselves into a heat of passion upon any trivial pretext whatever, and in that condition commit homicide,

and then set up the plea of manslaughter. Under such circumstances, the crime would be murder; for the law says that "malice is implied when no considerable provocation appears." Prior to the adoption of the codes, the statute of this state provided that, in order to constitute voluntary manslaughter, "there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person." (Hittell's Gen. Laws, sec. 1427.) While no similar provision is found in the Penal Code, yet it has never been even suggested that the law pertaining to the subject of manslaughter underwent any change upon the adoption of the code. Such provision was probably omitted from the code upon the ground that it was entirely unnecessary and surplusage, being simply a reiteration of a principle of law settled and established by all text-writers upon the subject.

In East's Pleas of the Crown, 234, the author says: "It must not, however, be understood that any trivial provocation which in point of law amounts to an assault, or even a blow, will of course reduce the crime of the party killing to manslaughter. This, I know, has been supposed by some, but there is no authority for it in the law. For where the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner of the continuance of it or beyond all proportion to the offense, it is rather to be considered as the effect of a brutal and diabolical malignity, than of human frailty; it is one of the true symptoms of what the law denominates malice; and therefore the crime will amount to murder, notwithstanding such provocation."

In the case of *Nichols* v. *Commonwealth*, 11 Bush, 586, the court said: "Heat of passion, in order to reduce a killing with a deadly weapon from murder to manslaughter, must have arisen from some provocation, which, out of a tender regard for the weakness of human nature, the law deems sufficient to arouse passions which the party is for the moment unable to control. . . . .

But we know of no case in which heat of passion, without regard to the cause producing it, has been held to reduce an unlawful killing with a deadly weapon from murder to manslaughter." In the case of *People* v. *Freel*, 48 Cal. 437, this court said: "But when the mortal blow is struck in the heat of passion, excited by a quarrel, sudden and of sufficient violence to amount to *adequate provocation*, the law, out of forbearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter." Nothing is more surely calculated to arouse the blood of some men to a heat of passion than grievous words of reproach, yet no words are sufficient provocation to reduce an offense from murder to manslaughter; and this principle is so well established in this state that discussion would be out of place. As to the general principle, see 1 Wharton's Crim. Law, sec. 472; *Rex* v. *Lynch*, 5 Car. & P. 324; *State* v. *Tooky*, 2 Rice's Dig. 104.

Appellant's counsel, with argument and authority, attack that portion of instruction No. 4 which reads: "To justify the killing of another in self-defense, it must appear that the danger was so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary."

Counsel places a construction upon this charge which is strained, not warranted by the language used, and undoubtedly never intended by the court who gave it. Counsel insist that the instruction should be interpreted as if it read: "To justify the killing of another in self-defense, it must appear (to the jury) that the danger was so urgent, etc., that the killing was absolutely necessary." The proper construction to be placed upon it is: "To justify the killing of another in self-defense, it must appear (to a defendant) that the danger was so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary." This seems to be the natural construction, the personal pronoun "his" thus

plainly referring to its antecedent, "defendant." By
the other construction there is absolutely no antecedent
in the clause to which the pronoun "his" could refer.
The court was stating an abstract proposition of law
pertaining to the right of self-defense possibly too lib-
erally for a defendant, as it omits the qualification that
it must appear to him "as a reasonable man." Reading
the proposition of law as embodied in this instruction
from a text-book, it would be absurd to say that the verb
"must appear" related to the jury or to anybody other
than the actor in the homicide, the party killing.

To support their contention in this regard, appellant's
counsel rely upon the case of *People* v. *Flahave*, 58 Cal.
249, and undoubtedly that case is directly opposed to the
views here expressed, but the opinion is not indorsed by
a unanimous court, and stands alone in the reports of
this state; for the cases of *People* v. *Gonzalez*, 71 Cal. 577,
and *People* v. *Dye*, 75 Cal. 113, upon which counsel rely
to give it support, entirely fail in that regard. Upon
the contrary, the great weight of authority supports the
validity of this instruction. This identical instruction
was given by the court in *People* v. *Nichol*, 34 Cal. 217,
and referring to the instructions given to the jury in
that case, the court said: "They are not even obnoxious
to criticism." The same instruction was again given in
*People* v. *Iams*, 57 Cal. 119; the court, after remarking
that it had examined the charge to the jury with great
care, said: "It is a long charge, completely covering all
the points in the case, and is, in our opinion, entirely
correct." It was again before the court in *People* v. *Gray*,
61 Cal. 164, 44 Am. Rep. 549, and the case was reversed
upon other grounds. And in *People* v. *Morine*, 61 Cal.
369, the instruction was again given *verbatim*, and re-
ferring to it, the court said: "It is claimed that the in-
struction given was disapproved by this court in the case
of *People* v. *Flahave*, 58 Cal. 249, and it may be conceded,
for the purpose of this case, that the position taken by
the learned counsel for the defense is correct, but it does
not follow therefrom that the judgment of the court

should be reversed. If other instructions were given which qualify and explain the objectionable instruction, the whole charge will be considered, and if, as a whole, it correctly presents the law applicable to the case, the judgment will not be reversed. In other words, it is not necessary that each instruction should fully state the law of the case, but an instruction may be helped out and explained by another on the same point; and in such a case the court will look to all the instructions in *pari materia* for the purpose of determining whether the law has been correctly given to the jury"; and the court affirmed the judgment. In *People* v. *Herbert,* which is also found in 61 Cal. 546, the same instruction was again directly approved. It was also given and approved in *People* v. *Raten,* 63 Cal. 425; *People* v. *Turcott,* 65 Cal. 129; and *People* v. *Guidice,* 73 Cal. 228. In the latter case, the opinion was written by Justice Temple, and concurred in by the whole court. The learned justice said: " The instruction in regard to the right to act in self-defense was taken from the case of *People* v. *Iams,* 57 Cal. 115, and has been approved by this court. It correctly lays down the law on that subject"; and in speaking of the instruction given by the court in the Flahave case, said: " This instruction was not qualified by any statement of the right to act upon apparent danger. Here the right of the defendant to act upon appearances was fully and clearly stated." The same reasoning applied to this case takes it also out of the authority of the Flahave case; for here, as in the Guidice case, the right of the defendant to act upon appearances was fully and clearly stated to the jury by the court. The doctrine of apparent danger was repeatedly explained to the jury. It is stated in a subsequent portion of the instruction under discussion, and is reiterated in various forms in the three following instructions. It would seem that this instruction has been before the court many times in the past, and with but a single exception has been sustained, many times as an abstract proposition of law, and many times when read and considered in connec-

tion with other instructions. As we have already seen, it can only be correct as an abstract proposition when the appearances " are directed to the defendant," and if superior courts are still inclined to give this instruction, it would be clearer and more satisfactory if the words "to the defendant as a reasonable man" were inserted after the verb "must appear." The jury, as men of ordinary intelligence, must have understood that the defendant was justifiable in killing the deceased, when it appeared to him as a reasonable man that he was in danger of losing his life or suffering great bodily injury. Indeed, taking all the instructions upon the question of self-defense *pari materia,* as was said in *People* v. *Morine,* 61 Cal. 369, the jury could not have been misled upon the question.

Counsel insist that instruction No. 5 is erroneous, inasmuch as it confined the defendant's right to kill the deceased to a state of facts where the deceased was endeavoring to "murder Bruggy, or do him some great bodily harm," and that it should have stated further, that " an attempt to kill Bruggy by the deceased, either with or without malice aforethought," would have warranted the defendant in taking the life of the deceased. The instruction is entirely correct, and does not attempt to limit or confine the right of the defendant to kill the deceased only in the case of an attack to murder or an attempt to do great bodily harm. If the defendant desired an instruction including other and additional conditions, he should have asked for it. (*People* v. *Franklin,* 70 Cal. 642; *People* v. *Northey,* 77 Cal. 618.)

Counsel complain of instruction No. 7. It is based upon a hypothesis founded upon evidence in the case, and if the facts existed as stated in the instruction, there is no question of self-defense involved, for the hypothesis stated makes a case of murder. If one person, with murder in his heart and a deadly weapon in his hand, pursues and overtakes another, and then and there fires the fatal shot, he is guilty of murder, regardless of what the deceased may have been doing at the moment of the

shooting; for murder was in his heart, and he acted upon that malice, and not upon any appearances created by the deceased. Again, if he had murder in his heart when he overtook the deceased, and *then* and *there* fired the fatal shot, no question of his declining a further struggle is involved in the issue. We think the instruction correct.

We see no error in the instruction given to the jury upon the question of drunkenness. As a principle of abstract law, the instruction is entirely correct. The court defined the two degrees of murder, and then instructed the jury as to the effect of the evidence of drunkenness upon the question of degree of the crime. In using the word " murder," the jury, as men of average intelligence, certainly did not understand that the court considered the defendant guilty of murder, or that it was their duty to so return their verdict. Necessarily is this the fact when we consider that previously the court had fully instructed the jury as to the definition of manslaughter, and stated to them that under the information and the evidence the defendant could be convicted of such offense.

While some of these instructions might have been improved to their advantage in clearness, we see no error sufficient to justify a reversal of the judgment. The practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions of the court. The instructions are for the enlightenment of the jury as to the law of the case, and a jury never enters into such character of analysis in construing them.

In this case, the evidence discloses that the killing of the deceased was to some extent the result of a drunken brawl; and it would seem that a verdict by the jury of imprisonment for life would have satisfied the law, but that is not a question to be here considered. The law gives the power of fixing the punishment in such cases to the jury, and the only appeal from their decision as to that matter is to the executive.

The judgment and order denying a new trial are affirmed.

McFARLAND, J., HARRISON, J., and SHARPSTEIN, J., concurred.

DE HAVEN, J., dissenting. — I dissent. In my opinion, the court erred in giving the following instruction: " If the murder was deliberate and premeditated, it was murder of the first degree. Otherwise it was murder of the second degree. And in determining the degree, any evidence tending to show the mental *status* of the defendant is a proper subject for the consideration of the jury. The fact that defendant was drunk does not render the act less criminal, and in that sense it is not available as an excuse. But there is nothing in this case to exclude it as evidence upon the question as to whether the act was deliberate and premeditated. *It was murder, whether premeditated or not.* And as between the two degrees of the offense, there is no presumption or intendment of law in favor of the first. Presumptively every killing is murder. But so far as the degree is concerned, no presumption arises from the mere fact of the killing, considered separately and apart from the circumstances under which the killing occurred. The question is one of fact to be determined by the jury from the evidence in the case, and is not a matter of legal conclusion."

This instruction was given in connection with others relating to the purpose for which the evidence of defendant's drunkenness was received, and doubtless the court in its charge intended to state the familiar rule which is found in section 22 of the Penal Code, to the effect that the jury might consider such evidence for the purpose of determining whether the defendant was capable, at the time of the homicide, of acting with that peculiar deliberation which is necessary in order to make an unlawful killing murder of the first degree; that is, whether his mental condition was such that

he could and did form in his mind a design deliberately and premeditatedly to take the life of deceased; but it must be conceded, I think, that the language chosen was not sufficiently guarded. The use of the word "murder," throughout the instruction, and particularly in the sentence, "It was murder, whether premeditated or not," must have been understood by the jury as intended to apply to the particular case before them, and indirectly as an expression of what the judge believed the evidence to establish.

Instructions should not, directly or indirectly, assume or suggest that a defendant is guilty of any degree of crime. (*People* v. *Lanagan*, 81 Cal. 144.) And when a defendant claims that the act of killing was done in self-defense, the act should not be spoken of by the judge as a murder.

Beatty, C. J., concurred.

Paterson, J., dissenting.— In my opinion, the seventh instruction was clearly erroneous. If the defendant declined any further struggle immediately prior to the firing of the shot, although he was the assailant, he was justified in shooting the deceased, if he believed upon reasonable ground that *he was in danger of receiving great bodily injury.* (Pen. Code, sec. 197, subd. 3.) The instruction ignores the fact that the defendant may have declined any further struggle, and tells the jury, in effect, that the defendant was not justified in shooting the deceased if he was the assailant, unless he believed that he was *in danger of losing his own life.*

I think that the learned judge of the court below erred also in giving the fourth instruction and the instruction upon the question of drunkenness.

This court granted a rehearing in this case because, in the opinion of the majority, the petition for a rehearing presented a new point as to which there were grave doubts. It is practically admitted in the opinion of the majority affirming the judgment of the court below that

the case upon the evidence is a close one. If, therefore, the instructions are contradictory or confusing, the court should be willing to grant the defendant another trial. There are cases in which the appellate court can say, that although the instructions are somewhat contradic- tory, yet, taken as a whole, upon all the evidence in the case, it is clear that no prejudice resulted to the defend- ant; but in this case the evidence is of such a character, it seems to me, that the infliction of the death penalty, at least, was unjust, and unless the instructions are clear and fair in all respects, a new trial should be granted. The evidence shows without conflict that the deceased and the defendant were personal friends, and there is nothing to show that they had ever before had any diffi- culty. Both were drinking heavily, evidently, and were in a maudlin state. The defendant took offense at some- thing the deceased said or did, and persistently annoyed him, and provoked deserved chastisement. The deceased was a much larger and a more powerful man than the defendant. The defendant had a fractured arm. The deceased threw the defendant violently upon the floor three times before the final struggle. After throwing the defendant down the third time and slapping his face, the deceased took out a pocket-knife, and holding it in his hand, said to Bruggy: " This is the way we fight in Germany." . There seems to be a conflict as to whether Bruggy had exhibited any weapon before the deceased took out his knife. When the deceased saw the defend- ant's pistol, he ran around the saloon, through the alley, . and into the back room of the saloon. The parties met right at the back of the saloon, and the deceased imme- diately grabbed the defendant by the arms, and pushed him back several feet to the billiard-table, and was push- ing him over against it when the fatal shot was fired. What occurred beyond what has been stated, or what, if anything, was said by either party after they met at the rear door of the saloon, and before the shot was fired, does not appear in the evidence. If the defendant did decline further struggle, he certainly was justified in

shooting the deceased, if he believed that he was in danger of receiving *great bodily harm.* The court cannot say as matter of law that he did not decline further combat. That was a question peculiarly within the province of the jury to determine, and the law should have been given to the jury upon such an assumption.